STATE EX REL. HAROLD P. CALDWELL, RELATOR, V. VAL PETERSON ET AL., COMPRISING THE BOARD OF STATE CANVASSERS, RESPONDENTS.

45 N. W. 2d 122

Filed December 9, 1950.   No. 32964.

*C. L. Clark* and *Charles F. Barth*, for relator.

*Clarence A. Davis*, for respondents.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an original action in mandamus, instituted in this court by the relator Harold P. Caldwell, against the members of the Board of State Canvassers as respondents, to require them to immediately proceed to a canvass of the votes cast at the general election held November 7, 1950, the returns of which are now in the possession of the Secretary of State; that upon the conclusion of the canvass the respondents declare the relator to be

the duly elected Attorney General of the state until January 4, 1951; and that the Governor of the state as chairman of the Board of State Canvassers issue to the relator a certificate of election instanter.

The relator's application for a writ of mandamus alleges in substance the following, which is admitted by the respondents' answer: At the regular general election held in this state in November 1948, James H. Anderson was elected Attorney General. He legally qualified for the office and served as Attorney General until he resigned in March 1950. Thereafter the Governor appointed Clarence S. Beck to serve as Attorney General until January 4, 1951, or until his successor should be elected and qualified. The appointee qualified by taking the oath and filing the bond, entered upon the duties of the office, and is still serving. On June 29, 1950, Harold P. Caldwell, the relator, filed on the Democratic ticket for the nomination for office of Attorney General to fill vacancy. He was the sole candidate to file. On August 8, 1950, the primary election was held in this state. The relator received practically all the votes cast on his party ticket for "Attorney General to Fill Vacancy." Thereafter the Board of State Canvassers, the respondents herein, did issue to the relator a certificate of nomination. Subsequent thereto the Secretary of State, in instructions to the various county clerks and election commissioners, directed that they should place upon the ballot for the general election of November 7, 1950, the relator's name as a candidate for the office of "Attorney General to Fill Vacancy." The instructions were complied with. The various county clerks and election commissioners did, in the official returns submitted to the Secretary of State, show the number of votes the relator received. There were no other candidates at the general election for Attorney General to fill vacancy. On November 27, 1950, the respondents, as members of the Board of State Canvassers, did meet in the office of the Secretary of State as required by

law, and then and there did inspect the returns of the various county clerks and election commissioners, and determined that the relator received 285,131 votes for the office as designated on the ballot. The respondents herein constituting the Board of State Canvassers thereafter informed the relator, on advice of counsel, they would not issue a certificate of election to the relator for the office for which he had been a candidate, refused to canvass said votes and to declare the relator elected to any office, and refused to issue to the relator a certificate of election as Attorney General to fill vacancy. (Apparently offer was made by the relator to qualify so that certificate of election might be issued to him.)

Respondents in their answer waived the service upon them of any process and summons or alternative writ of mandamus, and consented to the immediate hearing of the said cause.

No one at any time contested the relator's filing for nomination and the placing upon the ballots of the name of the relator.

The question to be determined is as follows: Is the Board of State Canvassers vested with the legal authority to canvass the votes of officers of the executive department of the state, to declare the officers elected, and to issue to them certificates of election?

There are certain sections of the articles of the state Constitution involved in this cause. In approaching a determination of this cause it is well to have in mind certain rules of law applying to the Constitution.

"The language of the constitution is to be interpreted with reference to the established laws, usages and customs of the country at the time of its adoption, * * *." In re Hammond, 83 Neb. 636, 120 N. W. 203, 23 L. R. A. N. S. 1173. See, also, State ex rel. Central Realty & Inv. Co. v. McMullen, 119 Neb. 739, 230 N. W. 677; State ex rel. Johnson v. Chase, 147 Neb. 758, 25 N. W. 2d 1; State v. Sheldon, 78 Neb. 552, 111 N. W. 372.

The words and terms of a constitutional provision are

to be interpreted and understood in their most natural and obvious meaning, unless the subject indicates or the text suggests that they have been used in a technical sense. See, Elmen v. State Board of Equalization and Assessment, 120 Neb. 141, 231 N. W. 772; Mekota v. State Board of Equalization and Assessment, 146 Neb. 370, 19 N. W. 2d 633; State ex rel. Johnson v. Chase, *supra*.

"Where the words of the Constitution are plain, direct, and unambiguous, no interpretation is needed to ascertain their meaning; a mere reading will suffice." Mekota v. State Board of Equalization and Assessment, *supra*.

The relator raises the point that Article IV, section 4, of the state Constitution relates to the former Bicameral Legislature and for that reason is not applicable to the present Unicameral Legislature. In this connection the relator asserts that Article IV, section 4, of the state Constitution was not amended when the Unicameral Legislature was established in this state and that accordingly there is no Speaker of the House of Representatives, and no "each house" of the Legislature, so the section and article of the Constitution cannot in any event be literally followed and complied with.

By the terms of Article III, section 1, of the Constitution, the restrictions and limitations of Article IV, section 4, of the document apply with the same force and effect to legislative proceedings under the unicameral system as it would to the bicameral. The portion of the section so declaring is the following: "All authority vested by the constitution or laws of the state in the Senate, House of Representatives, or joint session thereof, in so far as applicable, shall be and hereby is vested in said Legislature of one chamber. All provisions in the constitution and laws of the state relating to the Legislature, the Senate, the House of Representatives, joint sessions of the Senate and House of Representatives, Senator, or member of the House of Representatives,

shall, in so far as said provisions are applicable, apply to and mean said Legislature of one chamber hereby created and the members thereof." See Mekota v. State Board of Equalization and Assessment, *supra.*

Article IV, section 1, of the state Constitution provides: "The executive officers of the state shall be the Governor, Lieutenant Governor, Secretary of State, Auditor of Public Accounts, Treasurer, Attorney General, * * *."

There is no dispute in this cause but that the Attorney General is an executive officer. In this connection, where we use the terms "Attorney General" and "election of and canvass of votes for such executive officer" in this opinion, we mean also "Attorney General to Fill Vacancy" as the relator's name appeared on the ballot at the last general election.

Article IV, section 21, of the Constitution provides: "If the office of * * * attorney general, * * * shall be vacated by * * * resignation, * * * it shall be the duty of the governor to fill the same by appointment, and the appointee shall hold his office until his successor shall be elected and qualified in such manner as may be provided by law."

In compliance with this section and article of the Constitution, upon the resignation of James H. Anderson as Attorney General the Governor appointed Clarence S. Beck to the office.

This brings us to the canvass of votes of officers of the executive department and the declaration of the election of such officers.

The manner or method of determining and declaring the result of an election is in the first instance dependent on, and controlled by, the terms of the organic or fundamental law. See, 29 C. J. S., Elections, § 222, p. 325; Gragg v. Dudley, 143 Okl. 281, 289 P. 254.

Article IV, section 4, of the Constitution provides: "The returns of every election for the officers of the executive department shall be sealed up and trans-

mitted by the returning officers to the Secretary of State, directed to the speaker of the House of Representatives, who shall immediately after the organization of the house, and before proceeding to other business, open and publish the same in the presence of a majority of each house of the legislature, * * *. The person having the highest number of votes for either of said offices shall be declared duly elected; * * *."

We have heretofore pointed out that the quoted section and article is applicable to the Unicameral Legislature.

The following authorities are applicable to the effect of a constitutional provision such as Article IV, section 4, of the Constitution.

"A written Constitution is not only the direct and basic expression of the sovereign will, but is the absolute rule of action and decision for all departments and offices of government with respect to all matters covered by it and must control as it is written until it shall be changed by the authority that established it. * * * the legislature, the executive officers, and the judiciary cannot lawfully act beyond the limitations of such Constitution." 11 Am. Jur., Constitutional Law, § 44, p. 651. See, also, Travelers' Ins. Co. v. Marshall, 124 Tex. 45, 76 S. W. 2d 1007, 96 A. L. R. 802; Collins v. Martin, 290 Pa. 388, 139 A. 122, 55 A. L. R. 311.

We believe the language appearing in Article IV, section 4, of the Constitution heretofore quoted is plain, direct, and unambiguous, and means exactly what it says, that is, the votes cast for executive officers of the state are not to be canvassed by the Board of State Canvassers, but are to be canvassed by the Legislature.

In connection with Article IV, section 4, of the Contitution heretofore quoted, the following sections of the statutes are pertinent and consistent with the constitutional provision.

Section 32-923, R. S. 1943, provides: "Immediately upon the completion of the canvass by the county board the county clerk shall prepare a copy of the abstract

of the votes cast for President, Vice President, United States Senator, Congressman, all state officers, regents, judges of the Supreme Court and district courts, and all questions under the constitution voted upon by the whole people, which he shall seal up and endorse 'Abstract of votes of _____ county'; and direct to the Secretary of State, who shall prepare a tabular sheet of the votes cast for such officers and measures and preserve the same with the abstract of votes *from the respective counties for the use of the Legislature in making the official canvass as required by the constitution.*" (Emphasis supplied.)

Section 32-924, R. S. 1943, provides that the Board of State Canvassers shall consist of the Governor, Secretary of State, Auditor of Public Accounts, State Treasurer, and Attorney General.

Section 32-926, R. S. 1943, provides: "The abstracts of votes to be canvassed by the board of state canvassers shall be kept in the office of the Secretary of State, and shall only be opened in the presence of such board at the time provided in section 32-927."

Section 32-927, R. S. Supp., 1949, provides: "The board of state canvassers shall meet at the office of the Secretary of State on the third Monday after the election. If all of said returns have not been received at the office of the Secretary of State, the board may adjourn from day to day until the same shall have been received."

The Board of State Canvassers met as required by this section of the statutes.

Section 32-930, R. S. 1943, provides: "The votes cast for United States Senator, Congressmen, regents, judges of the Supreme Court and district courts, all state officers, and all questions under the constitution voted upon by the whole people, shall be canvassed by the Legislature at its next regular session."

Referring again to section 32-924, R. S. 1943, this section also provides specifically that the votes cast for President and Vice President shall be canvassed by a

board of canvassers, and, such canvass of the votes for candidates for President and Vice President and the return thereof shall be a canvass and return of the votes cast for the electors of the same party or group of petitioners respectively, and the certificate of such election made by the Governor shall be in accord with such return.

It is clear that in this special instance the State Canvassing Board is granted the power to canvass the votes as stated in this section of the statutes, and the Governor is authorized to issue a certificate of election in accordance therewith. This section does not conflict with the provisions of the Constitution.

Section 32-928, R. S. 1943, provides: "The board of state canvassers shall make an abstract stating the number of ballots cast for each office, the names of all the persons voted for, for what office they respectively received the votes, and the number of votes each received, in words at length, and stating whom it declares to be elected to the office, which abstract shall be signed by the canvassers in their official capacity, and as state canvassers, and have the seal of the state affixed."

In the light of the language appearing in Article IV, section 4, of the Constitution referring to state executive officers and the canvass of the vote of such officers and the declaration of the election, it is obvious that the last-quoted section of the statutes applies only and solely to the canvass of those votes which the Board of State Canvassers is authorized by law to canvass.

In the case of State ex rel. Benton v. Elder, 31 Neb. 169, 47 N. W. 710, 10 L. R. A. 796, the relator made a formal application for a writ of mandamus to compel the Speaker of the House of Representatives to open and publish the returns of the general election held on November 4, 1890, in the presence of a majority of each house of the Legislature, before proceeding to other business. The case deals directly with the canvass of

votes of executive state officers and interpreted Article V, section 4, of the Constitution, which is in identical language as Article IV, section 4, of the present Constitution. The court held that, as provided for in the constitutional provision, it was the duty of the Speaker of the House of Representatives, immediately upon the organization of the house, and before proceeding to any other business, to open and publish the returns of election as a duty resulting from his office of Speaker, and constitutes a ministerial duty positively imposed upon him by law. These duties were to be performed at the beginning of the session so that the parties elected to state executive offices might enter upon the duties of their respective offices.

In the case of State ex rel. Oldham v. Dean, 84 Neb. 344, 121 N. W. 719, an action in the nature of a quo warranto instituted by the relator against the respondent for the purpose of testing the right of the respondent to the office of judge of the Supreme Court, insofar as necessary here, this case approved the holding in State ex rel. Benton v. Elder, *supra,* as to the interpretation of what is now Article IV, section 4, of the Constitution with reference to the canvass of votes of executive state officers and the duty of the Speaker of the House of Representatives with respect thereto.

For cases from foreign jurisdictions covering the same propositions with provisions of constitutions identical or similar and holding the same as State ex rel. Benton v. Elder, *supra,* see State ex rel. Donnell v. Osburn, 347 Mo. 469, 147 S. W. 2d 1065, 136 A. L. R. 667; Gragg v. Dudley, *supra;* State ex rel. Morris v. Bulkeley, 61 Conn. 287, 23 A. 186, 14 L. R. A: 657.

The declaration of the result of an election is an indispensable adjunct to that choice, because the declaration of the election furnishes the only authentic evidence of what the choice is for the executive offices. The courts can take judicial notice of the fact of an election, but never the result of an election until some

declaration is made. Article IV, section 4, of the Constitution governs the canvass of the votes and declaration of election of executive officers. Unless the declaration is made in the way so provided, the process of the election is not complete.

The canvass of the votes and the declaration thereof is a necessary part of the election machinery. That the Speaker has a constitutional obligation to open, publish, and declare the returns of such elections is manifest by Article IV, section 4, of the Constitution.

The reason for the canvass of votes of executive officers as provided for in Article IV, section 4, of the Constitution is clear. The principle executive officers of the state constitute the Board of State. Canvassers, and the framers of the Constitution obviously thought that such officers should not be involved in a canvass of votes pertaining to offices to which they were elected or in which they had an interest. Likewise, the canvass of votes of the members of the Legislature was not left to the Legislature, but placed with the Board of State Canvassers for the same reasons, and in addition, for the reason that members of the Legislature would, by necessity, have to be qualified as provided for by law to organize the Legislature and carry into effect Article IV, section 4, of the Constitution.

The law of this state, at least since 1875, has never provided that the Board of State Canvassers canvass the votes of an election of the executive officers and declare the result thereof, or issue certificates of election to the parties elected. Likewise, the law of this state has not provided that the Legislature canvass the votes of the members of the Legislature to determine the result of the election, the declaration of election, or the issuance of certificates of election to the duly elected members of such body.

From an analysis of the authorities heretofore set forth it is obvious that a person elected to an executive office in this state cannot qualify for such office, re-

ceive a certificate of election, and take office until Article IV, section 4, of the Constitution is complied with, as heretofore stated.

The canvass of votes for executive state officers, as provided for in Article IV, section 4, of the Constitution will in all probability occur when the Legislature convenes as provided for in Article III, section 10, of the Constitution, as follows: "The Legislature shall meet in regular session at 12:00 o'clock (noon) on the first Tuesday in January in the year next ensuing the election of the members thereof." This would be Tuesday, January 2, 1951.

For reasons heretofore given, we conclude that the application for writ of mandamus as prayed for by the relator should be and is denied.

WRIT DENIED.